GOLDEN RULE LIFE INSURANCE COMPANY *et al.*, Plaintiffs-Appellants, *v.* RICHARD L. MATHIAS, Director of Insurance, *et al.*, Defendants-Appellees.

Fourth District   No. 16007

Opinion filed July 17, 1980.

Richard F. Watt, Thomas D. Allison, and Michael H. Slutsky, all of Cotton, Watt, Jones, King & Bowlus, of Chicago, and Edward D. McNamara, Jr., of Springfield, for appellants.

Howard P. Willens, Michael S. Helfer, and Joan S. Powers, all of Wilmer, Cutler & Pickering, of Washington, D.C., William S. Hanley, of Sorling, Northrup, Hanna, Cullen & Cochran, and James R. Potter, of Londrigan & Potter,

both of Springfield (John S. Kramer, Stanford Von Mayrhauser, and Alexandra de Saint Phalle, of counsel), for appellees.

Mr. JUSTICE WEBBER delivered the opinion of the court:

The plaintiffs, two corporations in the business of selling insurance, one corporation in the insurance agency business and several individuals desiring to become insurance agents and brokers, brought an action in the circuit court of Sangamon County against the defendant, the Director of Insurance of the State of Illinois, and a nonprofit corporation in the business of preparing and administering tests for the Director of Insurance. The gravamen of the amended complaint was that the individuals had been unable to pass the tests and had thus been denied licenses as insurance agents and brokers by the defendant Director of Insurance and that by reason of such failure on the tests the corporate plaintiffs had been unable to employ them. The amended complaint sought injunctive relief and damages under the due process clauses of the constitutions of the United States and the State of Illinois and the same relief under the Civil Rights Acts of 1866 and 1871 (42 U.S.C. §§1981 and 1983 (1976).) The trial court dismissed the amended complaint on motion of the defendants and this appeal followed.

■■■ Before proceeding to an analysis of the complaint, we must pause for a moment to comment on the motions to dismiss. The motion of defendant Educational Testing Service (ETS) sounded under section 45 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 45). The motion of defendant Mathias, as Director of Insurance of the State of Illinois (Director) apparently was meant to sound under section 48 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 48), since there were affidavits attached to it. However, the motion itself did not ask for dismissal on any of the grounds listed in section 48. The trial court properly treated it as a motion under section 45, as do we likewise. Under a section 45 motion defendants cannot challenge any properly pleaded facts in the complaint. *Cain v. American National Bank & Trust Co.* (1975), 26 Ill. App. 3d 574, 325 N.E.2d 799.

We are, therefore, presented with a pure question of pleading and law: Whether the complaint sets forth sufficient well-pleaded facts to require the defendants to answer and to proceed to trial. With one exception, we believe it does, and we therefore reverse and remand.

Under these circumstances it is necessary for us to examine and analyze the amended complaint in some detail. Count I sets forth most of the factual background. It first identifies the parties. Plaintiffs, Golden Rule Life Insurance Company and Golden Rule Insurance Company, are Illinois insurance companies, authorized to sell and service life insurance, and health and accident insurance. Plaintiff, L & R Insurance Agency,

Inc., is an Illinois corporation engaged in the sale of life, and health and accident insurance in Illinois. The corporate plaintiffs maintain headquarters in Lawrenceville, Illinois, and employ about 80 fulltime agents in Illinois. They recruit about 40 new agents each year.

The five individual plaintiffs were all denied licenses as insurance agents or brokers by reason of having failed portions of the Illinois Insurance Agent's and Broker's License Qualification Examination (examination.) They allege that they each completed all the required forms and paid all the required fees and are otherwise qualified, including trustworthiness, competency, business reputation and experience. Three of the five are blacks.

The defendant Mathias is identified as the Director of Insurance of the State of Illinois. Defendant ETS is identified as a not-for-profit corporation, headquartered in Princeton, New Jersey, with offices in Evanston, Illinois, and engaged in test development, test administration, and educational and occupational measurement research.

Count I goes on to allege that for many years prior to October 1975, the predecessors of the Director formulated, administered and graded the examination, but on March 12, 1975, and on July 1, 1976, those predecessors entered into contracts with ETS to formulate, administer and grade the examination. Copies of the contracts are attached to the amended complaint. This was done by ETS between October 1975 and August 1976.

Count I then alleges that this was not a fair nor proper test and was an illegal, invalid, arbitrary and capricious exercise of authority by the Director and his predecessors in the following respects:

"(a) The Examination covered subject areas inappropriate to an entry-level examination, and not likely to be encountered by a beginning agent or broker.

(b) The Examination was complex and confusing in form and structure, and required a high level of test-taking ability and of linguistic and vocabulary skills substantially and rationally unrelated to a determination of an applicant's competency and trustworthiness as an insurance agent or broker, and inappropriate to an entry-level examination.

(c) The Examination contained many obscure and highly technical questions, knowledge of which is and was substantially and rationally unrelated to a determination of an applicant's competency as an insurance agent or broker, and inappropriate to an entry-level examination.

(d) The Examination contained many questions subject to different interpretations and different answers by individuals

experienced and competent as insurance agents and brokers in the State of Illinois. Some of the different interpretations and answers, although correct in fact, were not recognized as correct by defendant ETS, with the result that there was an arbitrary testing standard substantially and rationally unrelated to a determination of an applicant's competency as an insurance agent or broker in the State of Illinois, and inappropriate to an entry-level examination.

(e) The 'cut-off' or passing score for each administration of such Examination was arbitrarily established without any actual or substantial relationship to a determination of competency as an insurance agent or broker, and at a level inappropriate to an entry-level examination.

(f) The Examination tested levels of cognition of subject matter substantially and rationally unrelated to a determination of an applicant's competency as an insurance agent or broker, and at a level inappropriate to an entry-level examination.

(g) The defendants offered an inadequate degree of guidance to applicants who took the Examination.

(h) The Examination was given by defendants without having been pre-tested in any meaningful way to determine how qualified applicants would respond to it or perform on it.

(i) The Examination was given by defendants without any job validation to determine whether in fact it appropriately measured competency to engage in the business of an insurance agent or broker in the State of Illinois.

(j) The Examination was not fairly designed to measure an applicant's competency or trustworthiness to be an insurance agent or broker in the State of Illinois, but served as a method of artificially limiting and controlling the number of individuals entering the business of insurance agent or broker in the State of Illinois without regard for competency or trustworthiness. Whether intended or not, the effect of the Examination was to restrict entry into the business of insurance agent or broker in the State of Illinois to no more than approximately one-half of the persons who make application."

The corporate plaintiffs allege that under certain provisions of the Illinois Insurance Code they lose the right to obtain 90-day temporary licenses for trainees if the passing grades of those persons falls below 50% during a 6-month period. Thus, they allege, they are strongly motivated to select persons with substantial test-taking abilities without regard to their competency and trustworthiness, and so are deprived of their rights to engage in the insurance business.

The individual plaintiffs allege that by reason of failing portions of the examination they have also been deprived of the right to engage in the insurance business, that they have suffered a loss of earnings and other benefits, loss of experience and eligibility for promotion, damage to their reputations and standing in the profession.

Count I then alleges a violation of the due process clauses of the constitutions of the United States and the State of Illinois, and asks for money damages from ETS for both the corporate and individual plaintiffs.

Count II limns the same factual background as count I, but bases itself on a modified examination. It alleges that in June 1976, the Director announced that such a modified examination would be developed by ETS; that ETS did so and such examination has been administered and graded by ETS since December 1976. The plaintiffs allege the same defects and deficiencies in this modified examination as they found in the former one covered by count I. Count II also alleges a violation of the due process clauses and in addition to damages from ETS, it asks for injunctive relief against both the Director and ETS.

Count III concerns itself with the former examination, *i.e.*, the one used between October 1975 and August 1976, and the subject of complaint in count I. It incorporates the factual background set forth in count I and then alleges racial discrimination as follows:

"(a) Passing rates of white persons who took each portion of the Illinois Insurance Agents and Brokers License Qualification Examination as formulated, administered and graded by defendant ETS, were significantly greater than the passing rates of black persons and of other minority racial group members who took such portions of the Examination.

(b) Passing rates of white persons who took similar examinations developed and administered by defendant ETS in other states were significantly greater than the passing rates of black persons and of other minority racial group members who took such examinations.

(c) The percentage of insurance agents and brokers in the State of Illinois who are white was and has at all relevant times hereto been significantly higher than the percentage of residents of the State of Illinois who are white.

(d) The proportion of black persons and of members of other racial minority groups who received passing scores on the Illinois Insurance Agents and Brokers License Qualification Examination, as formulated, administered and graded by defendant ETS, was and at all relevant times has been significantly less than the

proportion of black persons and of members of other racial minority groups who are residents of the State of Illinois."

In count III the corporate plaintiffs allege that they had advised defendants as early as February 1976, of their opinion that the examination was racially biased, but that defendants took no action. It is further alleged that defendants have not properly validated the examination pursuant to guidelines established by the Equal Employment Opportunity Commission of the United States. Count III asks for damages against ETS for both the corporate and the individual plaintiffs for deprivation of rights under the constitutions of the United States and the State of Illinois, and particularly under the Civil Rights Acts of 1866 and 1871 (42 U.S.C. §§1981 and 1983 (1976)).

Count IV follows the format of count III, except that it concerns itself with the modified examination employed since December 1976, and the subject of count II. It adds data which purports to show substantial adverse impact on the basis of race. Count IV asks for damages against ETS and for injunctive relief against both defendants.

To summarize the amended complaint: It alleges violations of the due process clauses of the Federal and State constitutions and of the civil rights acts; it asks for damages from ETS on account of both the former and the current examinations; and it asks that both the Director and ETS be restrained from further administration of the current examination.

Three issues are presented for our consideration: (1) Whether ETS's involvement constitutes the requisite State action in order to hold it to trial; (2) whether a cause of action is stated under the constitutions of the United States and of the State of Illinois in counts I and II; and (3) whether a cause of action is stated under the Civil Rights Acts of 1866 and 1871 in counts III and IV.

The fourteenth amendment to the United States Constitution prohibits "any state" from depriving any person of his property without due process of law. The Civil Rights Act of 1871 (42 U.S.C. §1983 (1976)) requires that in order to be liable one must be acting "under color of any statute, ordinance, regulation, custom or usage." This has been treated as the same thing as "state action" under the fourteenth amendment. (*United States v. Price* (1966), 383 U.S. 787, 16 L. Ed. 2d 267, 86 S. Ct. 1152.) The Illinois due process provision (Ill. Const. 1970, art. I, §2) has been interpreted as parallel to Federal decisions on State action. *Lavin v. Board of Education* (1974), 22 Ill. App. 3d 555, 317 N.E.2d 717.

It therefore follows that ETS's participation must be "state action" before it can be held liable under any of the three bases of the charge against it. Its motion to dismiss set up the lack of State action and its attack on the amended complaint in this court is two-pronged: (1) That

the facts do not support the theory, and (2) prior case law is contrary. ■■ The fundamental principle was stated by the United States Supreme Court in *Evans v. Newton* (1966), 382 U.S. 296, 299, 15 L. Ed. 2d 373, 377, 86 S. Ct. 486, 488: "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."

■ An examination of the contracts between the Director and ETS which are attached to the amended complaint reveals that among other things ETS will perform the following functions: (1) Be responsible for developing the examination in accordance with specifications developed by it; (2) that at all times it retains complete control over the examination, including ownership of the copyright, and physical control over printed copies of the examination; (3) be responsible for printing the examination, establishing testing centers and providing personnel to administer the examination; (4) to process all applications of those who desire to take the examination and become licensed; (5) to grade all examinations and determine who has passed; (6) to print for the Director the State licenses.

Such allegations fall squarely within the *Evans* doctrine. The Director and ETS have become ineluctably intertwined so far as the amended complaint and motion to dismiss are concerned. We are not dealing with a manifest weight of the evidence question. All of the foregoing is subject to proof and the proof may fail, but as a question of pleading, ETS's claim that it is a mere bystander has no basis.

ETS's second line of attack is based on prior case law, especially *Stewart v. Hannon* (N.D. Ill. 1979), 469 F. Supp. 1142, in which ETS was successful in its motion to dismiss. *Stewart* involved the testing of high school assistant principals in the city of Chicago as mandated by section 34—83 of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 34—83). The district court held that ETS's involvement in that testing procedure did not amount to State action and allowed the motion to dismiss. We find significant differences between *Stewart* and the instant case.

In its opinion, the district court described the process regarding principals in Chicago schools:

"To become a principal in the Chicago Public School system, a candidate must meet certain requirements of education and experience. In addition, each candidate must pass the principalship examination set by the Board of Examiners by statutory mandate. This examination comprises two parts: A written portion, which is the portion challenged in this lawsuit, and an oral portion. A candidate may not take the oral portion unless he has attained the designated passing score on the written portion. Further, a candidate must pass both portions in order to be placed on the

eligibility list, from which the Board of Education ultimately draws principals as openings occur.[1]" 469 E. Supp. 1142, 1144.

---

[1] Thus certification is itself no guarantee of an appointment.

It is thus apparent that ETS's nexus with the board of education is much further removed than in the case at bar. To qualify for a principalship, the applicant must (1) obtain the necessary education and experience; (2) must pass a written examination; (3) pass an oral examination; and after these requirements are met, the only result is to be placed on an eligibility list which, as Judge Leighton pointed out in his footnote, is not an open sesame to the position.

Far different is the examination here involved. It is the *sine qua non* of the ability to engage in the insurance agent or broker business in the very first instance. Furthermore, under the allegations of the amended complaint, the corporate plaintiffs were willing to employ the individual plaintiffs instanter if they passed the examination. In *Stewart*, the written examination was *a* significant part of the process; in the case at bar it is *the* significant part. It is a proper inference from the court's statement in *Stewart* that no teacher who failed the written examination for principal would be denied the right to continue teaching and no teacher who passed the examination would automatically be promoted to principal. On its facts we have no doubt that *Stewart* was a proper decision, but it is inapposite here.

ETS also relies on certain other United States Supreme Court decisions which we find distinguishable. The first of these is *Flagg Bros. v. Brooks* (1978), 436 U.S. 149, 56 L. Ed. 2d 185, 98 S. Ct. 1729. In *Flagg*, the court held that an execution sale under a warehouseman's lien by a private party as authorized by State law was not State action. Two factors were present which are not in existence in the instant case: (1) In *Flagg*, there was a total absence of official involvement—clearly not the case here; and (2) there was no element of exclusivity. The plaintiff had other means of resolving its dispute—again, clearly not the case here.

The second case is *Jackson v. Metropolitan Edison Co.* (1974), 419 U.S. 345, 42 L. Ed. 2d 477, 95 S. Ct. 449. In that case the defendant had cut off electrical service and the plaintiff argued that since the defendant was a partial monopoly and heavily regulated by the State, it was State action. The Supreme Court held it was not and said that the inquiry must be made as to whether there is a sufficiently close "nexus" between the State and the challenged action by the regulated entity so that the action of the latter becomes State action. ETS argues here that heavy regulation by the State does not convert the entities' action into State action. We agree, but in the instant case there is much more than heavy regulation. ETS is a

virtual partner with the State in a statutorily mandated activity. Using the nexus analysis, we find it close here, not remote as in *Jackson* or *Stewart*.

Both *Flagg* and *Jackson* seem to indicate a retreat by the court from the doctrine of *Evans*, but the retreat has not yet become a rout and a surrender.

In our judgment the case most nearly parallel to the case at bar is *Burton v. Wilmington Parking Authority* (1961), 365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856. In that case the defendant operated a restaurant in a parking facility. The lessor was an agency of the State, and the restaurant constituted an integral part of the State's plan to operate the entire facility as a self-sustaining unit. The plaintiff, a black, was denied access to the restaurant. Mr. Justice Clark said:

> "The State has so far insinuated itself into a position of interdependence with Eagle [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S. 715, 725, 6 L. Ed. 2d 45, 52, 81 S. Ct. 856, 862.

In our judgment the activity of ETS in the case at bar was State activity. Both as a matter of fact and as a matter of law, the amended complaint is sufficient in this regard to withstand the motion to dismiss.

Having resolved the question of State action, we turn next to the remaining issues which concern the sufficiency of the amended complaint under due process and civil rights theories. For convenience, we will consider these separately.

Counts I and II are due process claims. It is beyond dispute that the right of an individual to engage in the gainful occupation of his choice is protected by due process. (*People v. Brown* (1950), 407 Ill. 565, 95 N.E.2d 888.) It is likewise beyond dispute that the State has the power to make reasonable regulations of this right in order to protect the public welfare. *Schware v. Board of Bar Examiners* (1957), 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752.

We do not understand that the plaintiffs have any quarrel with the right of the State to regulate and license insurance agents and brokers and to administer examinations to that end. Such activity is mandated by the Insurance Code. (Ill. Rev. Stat. 1977, ch. 73, pars. 1065.41 and 1065.43.) Their contention is that the former and current examinations are not reasonably related to the statutory objective and have so pleaded.

No cause of action should be dismissed on the pleadings unless it clearly appears that no set of facts can be proved to sustain it. (*Phillips Construction Co. v. Muscarello* (1976), 42 Ill. App. 3d 151, 355 N.E.2d

567.) We are possessed by a state of considerable dubiety as to whether plaintiffs' allegations can be sustained at trial, but this is clearly an insufficient reason to deny them their day in court.

Counts III and IV bottom themselves on Federal civil rights statutes. Since we have arrived at different conclusions on the two statutes which are involved, we will consider them separately.

The first is the Civil Rights Act of 1866 (42 U.S.C. §1981 (1976)) which reads as follows:

> "*Equal Rights Under the Law*. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of their persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Plaintiffs make two claims under this statute: (1) The right of contract, and (2) the right of license. Both are *dehors* the statute. As the *Stewart* court pointed out, "[t]o whatever extent plaintiffs have a valid §1981 claim, that claim must run to the party * * * with whom plaintiffs' contractual rights have allegedly been impaired." (469 F. Supp. 1142, 1146.) Neither the Director nor ETS is a party to any contract with any of the plaintiffs. Indeed, any contract rights involved here would be among the plaintiffs *inter sese*.

As to the question of license, the context of the statute itself yields the obvious use of the word. "License" has a dual meaning: "Authority or liberty given to do or forbear any act." (Webster's New International Dictionary 1425 (2d ed. 1959).) The use of "subject to" in the statute, taken together with the *ejus generis* words, "punishment," "pains," "penalties," "taxes," and "exactions," yields the obvious meaning of forbearance under the dual definition cited above. If the former meaning were intended, "grant" or "confer" or some word of similar meaning would be required.

Plaintiffs' claim under section 1981 must fail and the trial court was correct in dismissing this aspect of the amended complaint.

The result must be otherwise under the Civil Rights Act of 1871 (42 U.S.C. §1983 (1976)), which reads:

> "§1983. Civil Action for Deprivation of Rights
>
> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

We have already held that ETS's function was State action, and therefore the "color of law" requirement of the statute is met. The next requirement is that purposeful discrimination must be shown. *Washington v. Davis* (1976), 426 U.S. 229, 48 L. Ed. 2d 597, 96 S. Ct. 2040.

The trial court held that there was no such allegation. We disagree. The following appears in the amended complaint:

"By using and relying on the Illinois Insurance Agents and Brokers License Qualification Examination, as formulated, administered, and graded by defendant ETS, under the circumstances set forth in paragraphs 10 through 16 above, defendants have intentionally and knowingly discriminated against applicants who are black or members of other racial and minority groups."

In addition, there is an allegation that plaintiffs informed the defendant Director of their complaints about the examination and that nothing was done.

In their argument here defendants rely on *Washington* and the recent United States Supreme Court case of *Personnel Administrator v. Feeney* (1979), 442 U.S. 256, 60 L. Ed. 2d 870, 99 S. Ct. 2282, for the proposition that a statute neutral on its face cannot be discriminatory. We do not read those authorities so broadly.

In *Washington*, the court held that the racial impact of the police test there involved called for further inquiry, but did not remand since it had been represented that the use of the particular test had been abandoned during the pendency of the action.

In *Feeney*, which involved veterans' preference in hiring, the court held the record sufficient to forfend the attack on the statute, but in speaking of proof of discrimination said:

"Proof of discriminatory intent must necessarily usually rely on objective factors, several of which were outlined in *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266. The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, 'the give and take of the situation.'" 442 U.S. 256, 279 n.24, 60 L. Ed. 2d 870, 887 n.24, 99 S. Ct. 2282, 2296 n.24.

The "practical inquiry" called for by the court obviously takes place at trial, not during the oratory sessions held at motion hearings in trial courts nor in arguments in this court.

There are sufficient allegations under section 1983 to require further inquiry. *Washington.*

For the foregoing reasons, the order of the circuit court of Sangamon County in dismissing the amended complaint insofar as it relates to claims under the Civil Rights Act of 1866 (42 U.S.C. §1981 (1976)) is affirmed; it is otherwise reversed and the cause is remanded for further proceedings in accordance with the views herein expressed.

Affirmed in part, reversed in part, and remanded.

MILLS, P. J., and LEWIS, J., concur.