**Robert SPATH, Plaintiff, Appellee,**

**v.**

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., Defendants, Appellants.**

**No. 84–1005.**

United States Court of Appeals, First Circuit.

Argued Feb. 8, 1984.

Decided Feb. 23, 1984.

John C. Wyman, Boston, Mass., with whom Barry L. Corman, Roche, Carens & DeGiacomo, Boston, Mass., George H. Gangwere, and Swanson, Midgley, Gangwere, Clarke & Kitchin, Kansas City, Mo., were on brief, for defendants, appellants.

Gary M. Feldman, Boston, Mass., with whom Richard J. Grahn, and Moulton, Looney & Grossman, Boston, Mass., were on brief, for plaintiff-appellee.

Before COFFIN and ALDRICH, Circuit Judges, and GIGNOUX,* Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Robert Spath, a senior and fourth year student at the University of Lowell on an "athletic scholarship," was ready to play on the Lowell ice hockey team when, on or about November 18, 1983 Lowell told him

* Of the District of Maine, sitting by designation.

he could not. The reason was that the National Collegiate Athletic Association (NCAA), of which Lowell is a member, limits participation in intercollegiate competition to four years, and under its Bylaw 5–1–(d)–(3), applicable to Division I competitors, each year of organized competition anywhere in the particular sport after age 20 is to be counted. Teams employing disqualified athletes are subject to NCAA sanction, including forfeiture of any games in which the disqualified athlete competes. Spath, who is a Canadian, had played on a team in Canada after his 20th birthday and before coming to Lowell. Accordingly, having already played three years at Lowell, he allegedly had run out his time.[1]

In October Lowell had applied to NCAA for an exemption, but on or about November 18 this was denied. Having been told that he was finally disqualified, Spath immediately brought this 42 U.S.C. § 1983 action against NCAA, and subsequently against Lowell, seeking a declaration of rights and affirmative relief by way of an order allowing him to play. After hearing, a temporary restraining order was granted him, and in December the case was tried and taken under advisement. Meanwhile, the temporary restraining order was continued until further order of court. Defendants appealed. After oral argument we vacated the restraining order, pending decision. We now reverse.

■ While, on the record, there was only a restraining order, and restraining orders are not appealable, substance must prevail over nomenclature. F.R.Civ.P. 65(b)'s emphasis on short duration of restraining orders is designed in part to limit a procedure that blocks appeal. Where the case has been tried on the merits, and the order has been continued without time limitation, clearly, in substance, it must be considered a preliminary injunction. On this appeal, there is no question as to our jurisdiction. *See* 28 U.S.C. § 1292(a)(1); *Sampson v. Murray,* 1974, 415 U.S. 61, 85–88, 94 S.Ct. 937, 950–951, 39 L.Ed.2d 166, *San Francisco Real Estate Investors v. Real Estate Investment Trust of America,* 1 Cir., 1982, 692 F.2d 814, 816–17.

Next, where the relief granted may be, in effect, a total victory for plaintiff, who seeks relief only for a period that may well be completed before a final decision on the merits, (the hockey season ends on March 4), the district court having other obligations beyond deciding whether one college student can play hockey, we regard it as extremely important that the four requirements for granting preliminary relief should prima facie appear to be met. Those requirements are (1) that plaintiff will suffer irreparable injury if the injunction is not granted, (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant, (3) that plaintiff has exhibited a likelihood of success on the merits, and (4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Mass. v. Bellotti,* 1 Cir., 1981, 641 F.2d 1006, 1009. While these requirements generally must be weighed inter sese, *see Maram v. Universidad Interamericana de Puerto Rico,* 1 Cir., 1983, 722 F.2d 953, 958, we find plaintiff has too seriously failed with respect to showing a likelihood of success.[2]

1. Spath's claim that he had not run out his time was based upon an interpretation of his "matriculation" date that would have exempted him from the Bylaw, but which countered NCAA's definition. There is nothing ambiguous or unreasonable about NCAA's rule, defining "matriculate" as the first day of attending classes.

  Spath also claims that Lowell, which only became Division I in 1983, was not fully a Division I school, because its scheduling made it ineligible for Eastern Collegiate Athletic Conference (ECAC) post-season play. This eligibility is irrelevant to Lowell's Division I status. It is not disputed that Lowell is eligible for the NCAA's Division I championships, and this claim, as well, is without merit.

2. We do not concur with the court's attempt to persuade NCAA's counsel that it would suffer no injury, or its stressing the injury to plaintiff's "life." The precedent of a court's vacating a rule is injury enough. So it may be the team's "life" when a winning playoff goal is disallowed, but in sports agreed-upon rules are fundamental.

Plaintiff states several counts against the NCAA and Lowell. He claims the Bylaw adopted by the NCAA and enforced through its member institutions deprives him of equal protection, and due process of law. He also asserts state law claims for breach of contract against Lowell, and for tortious interference with contract against NCAA.

*State Action*

As a threshold matter, NCAA contends that for purposes of the constitutional claims it is not a state actor. NCAA is an association of nearly 1,000 colleges and universities, approximately one half of which are private, and one half state supported. Its purpose is to establish, and oversee enforcement of, rules governing all facets of intercollegiate athletics. While hitherto the weight of authority would support plaintiff that NCAA is sufficiently state connected to incur 42 U.S.C. § 1983 liability, *Rivas Tenorio v. Liga Atletica Interuniversitaria,* 1 Cir., 1977, 554 F.2d 492, recent trends have limited that concept. *E.g., Rendell-Baker v. Kohn,* 1982, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418, *Blum v. Yaretsky,* 1982, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534. We need not, however, pursue this question. Since Lowell, at least, as a "state funded" university, may be a state actor, we move, instead, to Spath's particular merits.

*Unequal Protection*

Spath's contention is that he is Canadian; that Canadians, for various reasons, play more competitive hockey, after age 20 and before coming to college, than do Americans, and that the Bylaw is particularly directed against aliens. He therefore seeks close scrutiny of the purposes underlying the rule. NCAA counters that the Bylaw is intended to further the reasonable goal of equalizing collegiate competition by preventing older, more experienced athletes from dominating.

■ There being no fundamental right to education, *see San Antonio Independent School Dist. v. Rodriguez,* 1973, 411 U.S. 1,

37, 93 S.Ct. 1278, 1299, 36 L.Ed.2d 16, there could hardly be thought to be a fundamental right to play intercollegiate ice hockey. *See Rivas Tenorio v. Liga Atletica Interuniversitaria,* 554 F.2d 492, ante at 497. In addition, so far as Spath is concerned, the Bylaw is facially neutral.[3] That being the case, his burden is the heavy one of proving that NCAA purposefully discriminated against aliens as a class. *Arlington Heights v. Metropolitan Housing Development Corp.,* 1977, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450; *Washington v. Davis,* 1976, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597. Although "[t]he impact of the official action ... may provide an important starting point," generally courts must look to evidence other than statistical impact to support a finding of discriminatory purpose. *Arlington Heights,* ante, 429 U.S. at 266, 97 S.Ct. at 564.

■ Here, plaintiff's evidence falls far short. As to intent, plaintiff cites statements from the NCAA debate, of which the most relevant were made by certain opponents of the Bylaw, to the effect that its intent was to harm aliens. These debates, or "legislative history," however, disclose such diverse views from the floor that it would seem impossible to sustain the burden of proving such a consensus. It was, at one point, recognized that a similar prior rule had been struck down as discriminating against aliens. That rule was discriminatory on its face. *Howard University v. NCAA,* D.C.Cir., 1975, 510 F.2d 213. Plaintiff would have it that the new Bylaw, neutral on its face, is merely a veiled attempt to reconstitute the old. Rather, in recognition that the new Bylaw might present problems for Canadians, who attend five, rather than four years of high school, the Bylaw's age limit was raised from 19 to 20. These changes seem indicative of an intent—whether voluntary or involuntary— not to discriminate. Indeed, although it was recognized that perhaps more aliens,

---

**3.** Plaintiff points to an exception for participants in United States foreign aid and armed services as a facial discrimination against aliens. We have no data indicating the effect of this to be other than minimal.

*e.g.*, soccer and track competitors, as well as Canadian hockey players, would be affected by an age and experience rule than would Americans, the debates related primarily to the desirability, vel non, of restricting older and more experienced players generally, with the emphasis being on experience. The most the record might show is an overall awareness of a possible greater impact on aliens. Plaintiff's statistics as to impact tend to bear out these concerns, although the most that can be said is that the Bylaw has been officially applied to a few more aliens than Americans. On the other hand, an overwhelming majority of informal inquiries were received from Americans. Plaintiff, in our opinion, has not approached the point of establishing the constitutionally required "purposeful intent" to discriminate against aliens because of their alienage. *Arlington Heights,* ante, 429 U.S. at 266, 97 S.Ct. at 564.

■ The primary question, therefore, is whether the rule is reasonable. It seems entirely so. Professionalism, through granting scholarships to older and more experienced students, may be unfortunate. College athletics are not professional sports, played primarily for the winning, however pleasing success may be, but are, within reason, democratic opportunities for students. Fairness suggests restrictions against those who may be excessively qualified. The fact, if it be the fact, that a higher percentage of Canadians, or aliens, fall into this special class is no more unlawfully discriminating than it would be if, to equalize college basketball, players who exceeded 6′6″ were barred, and the majority of those turned out to be black. Plaintiff has a very heavy burden to show the rule was intended to discriminate against aliens rather than to have a legitimate purpose. Simply compiling statistics is not enough.

*Due Process*

■ Spath also claims his due process rights have been violated, in that his scholarship gave him a contractual "property" interest in playing ice hockey for Lowell, and this right was denied without proper procedures. To begin, we note that his scholarship was reviewed and renewed on a yearly basis. It is elemental that due process rights do not attach to expectancies, *Board of Regents v. Roth,* 1972, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548. Spath, therefore, must allege a deprivation of his property without due process *after* he accepted his 1983 scholarship. At this time, under the Bylaw, he had no right to play hockey. Even if we were to assume Spath's scholarship affords him a contractual right to play, rather than merely to have his tuition paid, which Lowell has declared it will do in any event, we fail to see what further procedures were required here. Lowell appealed to NCAA for a special exemption, which NCAA denied. Spath alludes to a lack of notice of the rule. The rule, however, was effective, published, and available to anyone interested, from 1980 forward. NCAA cannot be charged with giving personal notice to every student.

*Contract*

■ If Lowell is in some difficulties other than the Bylaw, it can only be a matter of contract. Spath has appended a state law claim that his scholarship included an obligation to allow him to play. His scholarship made clear reference to the NCAA rules, and it is difficult to conceive how Lowell could be thought to have obligated itself to violate them.

It is equally difficult to think a court would order a college to place a student on a varsity team as a matter of contract. Specific performance of a personal service contract, irrespective of the NCAA rule that might require forfeiture of Lowell's games, seems out of the question. The claim that NCAA wrongfully induced Lowell to break a contract is altogether frivolous.

The district court's order is vacated.