**Susan E. JOHNSON**

v.

**EDUCATIONAL TESTING SERVICE, INC.**

Civ. A. No. 72–1837–Z.

United States District Court, D. Massachusetts.

June 8, 1984.

Jack R. Pirozzolo, Mary Jeanne Tufano, Willcox, Pirozzolo & McCarthy, Boston, Mass., for plaintiff.

George C. Caner, Jr., Ropes & Gray, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Defendant Educational Testing Service, Inc. ("ETS") is a non-profit corporation which prepares and administers various educational tests, including the Law School Admission Test ("LSAT"). Plaintiff Susan Johnson, then a college senior, took the LSAT in October and December 1970 and received score reports of 317 and 323, respectively. After the April 17, 1971 LSAT test date, ETS reported a score of 623 for Johnson, an unusual increase. She was soon thereafter offered admission to the University of California Law School at Berkeley ("Berkeley"), which she accepted. In June 1971, however, ETS notified plaintiff that it had serious doubts concerning the validity of the score reported for her on the April 17 LSAT. After a series of communications between the parties and actions by both, discussed below, ETS on September 3, 1971 cancelled the score. It also orally informed Berkeley of the cancellation and sent written notice to Berkeley and the other law schools to which plaintiff had requested her scores be reported. Berkeley by letter that same day informed plaintiff that its offer of admission had been withdrawn.[1]

---

1. By September 21, 1971 Berkeley provisionally admitted plaintiff to classes; she was fully rein- stated by October 11, 1971.

Plaintiff brought this diversity action against ETS alleging that its invalidation of the score was arbitrary, depriving her of her right to due process under the Fifth and Fourteenth Amendments to the United States Constitution; that ETS breached certain warranties it made to plaintiff concerning the LSAT; that its actions in reaching the determination to invalidate the April score breached its contract with plaintiff; that it interfered with the advantageous contractual relationship between plaintiff and Berkeley; and that it defamed plaintiff. ETS has moved for summary judgment on all five counts of the complaint.

The following facts relating to plaintiff's due process claim are undisputed.[2] ETS is a non-profit corporation created by the American Council on Education ("ACE"), the College Entrance Examination Board ("CEEB") and the Carnegie Foundation for the Advancement of Teaching, to carry on educational testing activities.[3] In 1971 it was managed by a 16-member Board of Trustees. The Presidents of ACE and of CEEB were trustees ex officio; and other trustees were chosen by the Board from candidates nominated by ACE, CEEB, and the Board itself. Two of the trustees were officers of state universities.

ETS designs and administers the LSAT under an agreement with the Law School Admission Council ("LSAC"),[4] which determines the general policy concerning conduct of the LSAT program. Under the agreement, ETS receives its costs plus a fee, equal to 13% of the costs.

Plaintiff contends first that state schools' membership in ACE, CEEB and LSAC, together with the fee payments allowed under LSAC's contract with ETS, amount to state control of ETS or such state involvement that ETS actions must be deemed those of the state; and second, that ETS exercised a public function in that state law schools delegated to ETS in its administration of the LSAT "virtual veto power" over what candidates would be selected for admission.

■ The latter argument can be readily dismissed. Plaintiff does not suggest that administration of standardized tests for law school admission is a function " 'traditionally the exclusive prerogative of the state,' " *Blum v. Yaretsky*, 457 U.S. 991, 1005, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974)), as it must be to support a finding of state action. *Rendell-Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982). Nor has she adduced any facts to contradict defendant's evidence that law schools make their own independent admissions decisions.[5]

---

**2.** Contrary to plaintiff's assertion, there remains no genuine issue of fact material to resolution of her claim under Count I; the question of law presented can be resolved accepting plaintiff's statement of facts.

**3.** According to material submitted by plaintiff, the ACE is a council of approximately 200 educational associations and 1500 institutions of higher education, (with some 60 affiliated institutions), founded as a center of cooperation for the improvement of education. It is governed by a 29-member Board of Directors. The CEEB is a non-profit corporation comprised of educational institutions and organizations, with the purpose of assisting in and coordinating activities connected with the transition of students from secondary schools to colleges, such as admissions procedures and testing. It is governed by a 25-member Board of Trustees. Some members of both ACE and CEEB are publicly supported institutions and officials of state educational institutions have served on the Boards of ACE and of CEEB.

**4.** The Law School Admission Council is a non-profit corporation composed of approximately 141 law schools; 63 members are state-supported. Its functions are analogous to those of the CEEB in that it provides services to law schools relating to admissions, and has ultimate responsibility for carrying on testing programs used for admission to law schools. By agreement with ETS, the council has delegated responsibility for design and administration of the LSAT to ETS.

**5.** The situation is thus clearly different from that in the cases upon which plaintiff relies. *Martin v. Educational Testing Service, Inc.*, 179 N.J.Super. 317, 431 A.2d 868 (N.J.Super.1981) and *Golden Rule Life Insurance Co. v. Mathias*, 86 Ill.App.3d 323, 41 Ill.Dec. 888, 408 N.E.2d 310 (1980), involved examinations administered by

█ Plaintiff's funding argument likewise fails in light of *Rendell-Baker v. Kohn.* There, the Supreme Court concluded that near-total government funding of a school did not constitute a sufficient nexus to make the school's personnel actions those of the funding state. *Id.* at 840, 102 S.Ct. at 2770. The amount of public funds, if any, coming to ETS from state members of LSAC is far less than the support held insufficient to constitute government action in *Rendell-Baker.*

Plaintiff has made no showing of any direct state regulation of ETS testing activities, including the decision to invalidate a score. She would, however, hold the state responsible for defendant's invalidation of the score by finding a substantial degree of public participation in ETS's action and entanglement between the state and ETS which amounts to a symbiotic relationship, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). She relies upon *Rivas Tenorio v. Liga Atletica Interuniversitaria,* 554 F.2d 492 (1st Cir.1977), where the First Circuit held the action of an association of seven Puerto Rican colleges, including four state supported ones, to be state action. The continuing validity of *Rivas Tenorio* is questionable in the light of *Blum* and *Rendell-Baker,* as the First Circuit has recognized, *Spath v. National Collegiate Athletic Association,* 728 F.2d 25, 28 (1st Cir. 1984). Even if *Rivas Tenorio* remains good law, however, most of the factors the court there found to indicate a state nexus are lacking here. While ETS does provide a valuable service to members of the LSAC, less than one-half of those members are public institutions; there is no indica-

tion that public institutions provide the "vast majority" of ETS's capital or that state instrumentalities are a dominant force in determining its policy and dictating its actions. Indeed, the undisputed facts concerning its funding and governance are to the contrary. ETS is controlled not by member schools but by a self-perpetuating Board of Trustees, only some of whose members are nominated by organizations partially composed of state universities. Such a tenuous connection is far from the symbiosis required to make ETS actions attributable to the state.

As a matter of law, therefore, I find that ETS action was not "state action" under the Fourteenth Amendment.[6] Because its actions were no subject to the requirements of the due process clause, defendant is entitled to summary judgment on Count I of the complaint.

There remain plaintiff's further claims that defendant's actions violated state contract and tort law.

Count II of the complaint alleges that plaintiff was induced to contract with ETS to take the LSAT by certain express and implied warranties made by ETS concerning the nature and purpose of the test, that ETS breached its warranties causing plaintiff to receive varying scores, and then concealed its breach by invalidating her high score. Plaintiff alleges no damage from the variation of scores in itself, and Count II thus amounts to an assertion that the cancellation was done in bad faith. As such, it states no claim independent of that in Count III, and I consider it in conjunction with Count III.

---

ETS for state licensing authorities which were the sole requirement for and the sole method of obtaining a real estate and insurance broker's license, respectively, for practice in the state. (In *Martin* ETS agreed that it was acting as the agent of the state, and in *Golden Rule* the state licensing commission worked closely with ETS in developing the test, having final review power over. the form and content of the questions.) Here, ETS's role more closely resembles that in *Stewart v. Hannon,* 469 F.Supp. 1142, 1147 (N.D.Ill.1979), where satisfactory performance in the ETS-administered test was only one re-

quirement of several for those seeking to be high school principals, an oral examination and experience being necessary as well. The court there held that ETS was not engaged in state action.

**6.** Other courts have reached the same conclusion. *See Brown v. Educational Testing Service,* No. C–71–2029–AJZ (N.D.Cal. Jan. 31, 1972), *K.D. v. Educational Testing Service,* 87 Misc.2d 657, 386 N.Y.S.2d 747 (1976).

In Count III plaintiff alleges that defendant breached its contractual obligation to her to report her scores, to investigate the circumstances of the testing if doubts were raised about her score, to cancel the score only if there was adequate reason to question its validity, and to make that determination in good faith. The terms of the contract are contained in the 1970–71 LSAT Bulletin of Information. The relevant portion provides: "If doubts are raised about a candidate's scores after they have been reported, ETS will investigate the circumstances of the testing. Educational Testing Service reserves the right to cancel any test score, if in the opinion of ETS there is adequate reason to question its validity. Before exercising this right, ETS will offer the candidate a retest at no additional fee." Accepting plaintiff's contention that Massachusetts law[7] requires such a unilateral decision by a party to a contract to be reasonable,[8] and her contention that defendant had an obligation to make its decision in good faith, the facts appearing from the parties' submissions, even viewed most favorably to plaintiff, here compel the conclusion that ETS's conduct complied with both requirements and in no way constituted a breach of its contract with plaintiff.

The validity of the April score was originally questioned by the Admissions Office of the University of Pennsylvania in a call to ETS on May 11, 1971. After that call, three members of the ETS Test Security Office ("TSO") individually reviewed the answer sheet and registration form for that administration and those in October and December and concluded that the April forms were not written by the person who wrote the October and December forms. The documents were sent to Jan Beck, a handwriting expert, who reached the same conclusion.

The ETS Board of Review was an internal ETS committee with responsibility for reviewing information on questioned test scores and deciding what action should be taken. On June 8, Susan Johnson's case was presented to the Board as one of several instances of suspected irregularities. Based on the documents from the TSO and the opinion of Beck, the Board concluded that serious doubt existed about the validity of plaintiff's April score and sent a letter to plaintiff so informing her. The letter, signed by Louis Fowler as Secretary of the Board of Review, stated that before taking any further steps, the Board would appreciate receiving from her any additional information she wished to provide. It offered plaintiff the further options of taking a free retest under special supervision, or requesting that the score be cancelled, noting that it would give recipients of the cancellation notice no reason for the cancellation.

By July 1, plaintiff had retained counsel and requested that ETS consider additional information. During that same period, Columbia and Berkeley had called ETS to request information about the April score. At its meeting of July 13, 1971, the Board had before it letters from two Harvard faculty members, the President and the Dean of Connecticut College, supporting plaintiff's ability and integrity, as well as a letter from the Associate Dean of Radcliffe College speaking highly of plaintiff's integrity and noting her recommendation that plaintiff take a retest. The Board decided to consult a second handwriting expert, Ordway Hilton.

At a further meeting on July 22, 1971, the Board had, besides the materials above, a six-page letter from plaintiff's counsel setting forth plaintiff's view of the facts, supporting materials, and requests for information from ETS; plaintiff's college transcript; medical records concerning her stress-related problem; plaintiff's affidavit describing the circumstances of the April test; the affidavit of Kay Sternfeld, who described tutoring plaintiff in the techniques of standardized test-taking; and handwriting samples provided by plaintiff.

---

7. The parties agree that Massachusetts law governs the contract claim.

8. *See Salem Glass Co. v. Joseph Rugo,* 343 Mass. 103, 176 N.E.2d 30 (1961).

A TSO member reported that Hilton had in a telephone call stated his conclusion that a different person had written the April test from the one who had written the two earlier tests. The Board deferred action until receipt of a written report to that effect from Hilton.

On August 5, plaintiff and her attorney met with John Kramer, general counsel to ETS, Fowler, and Thomas Robinson, Associate Program Director of the LSAT Program. Plaintiff refused to take a retest and it was agreed that she would retain a handwriting expert, Elizabeth McCarthy. At the end of August, McCarthy orally informed Fowler of her conclusion that plaintiff had written all the documents in question. ETS decided to seek the opinion of a fourth expert and sent the documents to Paul Osborn.

On September 3, the Board met again about plaintiff's case. During the meeting Fowler spoke to Osborn and reported that Osborn believed the April test had been written by a different person. The Board voted unanimously to cancel the score, called Berkeley to inform it of the cancellation, and sent a written notice of cancellation to the other schools plaintiff had designated as recipients of score reports.

The Board of Review's decision to cancel the score thus was made after a lengthy process, including four meetings of the Board. The Board had requested (in its letter of June 11, 1971) and accepted exten-sive documentation submitted on behalf of plaintiff. It considered plaintiff's submissions, as well as those of its own Test Security Office personnel, the scores themselves, and the opinions of four handwriting experts, three unfavorable to plaintiff. Its conclusion that there was adequate reason to question the validity of plaintiff's score was a reasonable one, reached with deliberation in good faith.[9] ETS's cancellation of the April score was in accordance with the terms of its unambiguous contract with plaintiff, and it is therefore entitled to summary judgment on Count III of the complaint.

■ There remain plaintiff's two tort counts. In one she alleges that ETS defamed her by informing "through various oral and written communications persons and institutions" that the April score was invalid. In the other she alleges an interference with her contractual relationship with Berkeley. The parties agree that ETS notified Berkeley, the only recipient specified in the complaint, both orally and in writing of the invalidation.[10] Identical notices were sent to the other institutions to which plaintiff had requested that her scores be reported.

Even accepting plaintiff's contention that the notice of cancellation was defamatory, carrying the innuendo that it was caused by dishonest conduct on plaintiff's part, the undisputed facts support defendant's claim that the communication was privileged.

---

9. Plaintiff's claim that additional discovery is needed on the issue of bad faith is without merit. In contrast to the situation in *Parrish v. Board of Commissioners of the Alabama State Bar,* 533 F.2d 942 (5th Cir.1976) on which she relies, defendant here has not simply denied misconduct. The record here contains not only the affidavits of the Board members asserting their reasons for reaching the decision, but also the documents before the Board at each stage of the proceedings. Regardless of whether the result was right or wrong, the record makes clear that the decision had good faith grounds. *See Swencki v. Educational Testing Service,* No. C81–0689 L(A) (W.D.Ky. May 26, 1983); *K.D. v. Educational Testing Service,* 87 Misc.2d 657, 386 N.Y.S.2d 747 (1976). Plaintiff has offered nothing to controvert defendant's position. Given this lack of any factual dispute, summary judgment is appropriate on the issue of good faith.

*See Packish v. McMurtrie,* 697 F.2d 23 (1st Cir. 1983).

10. The notice was as follows:
"NOTICE OF CANCELLATION OF TEST SCORES
This is an official notice from Educational Testing Service that the scores for the candidate and the administration as indicated have been cancelled and are no longer retained in our records.
Susan E. Johnson
D22 Adam[sic] House Harvard
Cambridge, Massachusetts
April 1971 LSAT
In our considered opinion, these scores should not be used as a basis for judgments concerning the candidate."

ETS's interest in ensuring the validity of the scores it reports is undisputed; the law schools involved had an interest in receiving accurate score information as part of their admissions process. Under the law of all the states in question,[11] communications between those having such a common interest are privileged unless improperly motivated or unsupported by reasonable cause. Cal.Civ.Code § 47(3) (1982), *Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982); *Williams v. Taylor*, 129 Cal.App.3d 745, 181 Cal.Rptr. 423, 426 (1982); *Sheehan v. Tobin*, 326 Mass. 185, 93 N.E.2d 524 (1950); *Buckley v. Litman*, 57 N.Y.2d 516, 443 N.E.2d 469, 457 N.Y.S.2d 221 (1982); *Toker v. Pollak*, 44 N.Y.2d 211, 376 N.E.2d 163, 405 N.Y.S.2d 1 (1978); *Baird v. Dun & Bradstreet*, 446 Pa. 266, 285 A.2d 166 (1971); *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583 (1980). Plaintiff has adduced no evidence that ETS's conduct in cancelling the score was unreasonable and undertaken in bad faith. Its communication of the cancellation to institutions that had received the score was therefore privileged, and defendant is entitled to summary judgment on Count V.[12]

For the same reason, plaintiff's claim that ETS interfered with her advantageous contractual relationship with Berkeley fails. Such interference to be actionable must be intentional and without justification. ETS was justified in communicating its decision to cancel plaintiff's score to the schools that had received the score.

*Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 112 P.2d 631 (1941); *Bledsoe v. Watson*, 30 Cal.App.3d 105, 110, 106 Cal.Rptr. 197, 199 (1973). *See also Swencki v. Educational Testing Service*, No. C 81–0689 L(A) (W.D.Ky. May 26, 1983).

Accordingly, defendant's motion for summary judgment on all counts of the complaint is allowed.[13] Judgment may be entered for defendant.

---

**11.** In this diversity action Massachusetts choice of law rules determine the applicable substantive law, which under those rules would be that of each place of publication. *Harkaway v. Boston Herald Traveler Corp.*, 418 F.2d 56 (1st Cir. 1969); *Brewster v. Boston Herald-Traveler Corp.*, 188 F.Supp. 565 (D.Mass.1960). *See also Pevoski v. Pevoski*, 371 Mass. 358, 358 N.E.2d 416 (1976); *Restatement (Second) of Conflict of Laws* § 149 (1971). The institutions in question are located in California, Massachusetts, New York and Pennsylvania.

**12.** In memoranda filed in connection with this motion, plaintiff asserts a claim for defamation in various communications to "persons" identi-

fied only by that term in her complaint. Under applicable Massachusetts law, one of the specified communications, the copy of a letter from ETS to Berkeley sent to Walter Leonard, Special Assistant to the President of Harvard, is clearly within the bounds of the privilege above. The remaining communications are not actionable because they were made only to plaintiff or her agents. *Burns v. Barry*, 353 Mass. 115, 228 N.E.2d 728 (1967).

**13.** Plaintiff's assertion that her complaint states a cause of action for intentional infliction of emotional distress, made for the first time in her most recent brief, is without merit.